The opinion for the full North Carolina Industrial Commission in the above entitled action, by Matt H. Allen, chairman, filed 11 July, 1931, is as follows:
"This was an appeal to the full Commission from an award of Commissioner Dorsett denying compensation. The claimant was employed by the Dairymen's Creamery which was located just outside of the city of Asheville on Route No. 4. His duties consisted of delivering milk to cafes, stores and hospitals in the city of Asheville, and ordinarily his day's work ended about seven o'clock p.m., but he was required to deliver milk outside of regular hours if called upon to do so, and at the time of this accident there was evidence that there was a price war on in Asheville among those engaged in selling dairy products and that it was the duty of this claimant to solicit business and to engage and encourage the patronage of all regular customers. The claimant lived on the premises of the employer and it appears from the evidence that it was his duty after the day's work to return the truck to the premises of the employer.
On 13 September, 1930, the claimant, after making the regular rounds and making certain special deliveries, parked the truck down town and attended to business of his own and engaged in certain amusements such as playing pool and that sometime between 11 o'clock and midnight, while driving the truck from the city of Asheville to the premises of the employer for the purpose of returning the truck to its proper place the plaintiff met with an accident resulting in a compound fracture of the right leg with extensive bone injuries and injury to the muscles of the leg, with paralysis of one group of muscles in the front of his leg, and with a simple fracture of the left leg.
Upon this evidence Commissioner Dorsett found as a fact that there was a diversion on the part of the plaintiff from the scope of his regular employment and that although the accident occurred while he was in the act of returning the truck to his employer's premises as he was required to do, nevertheless the accident did not arise out of and in the course of his employment. *Page 198 
The full Commission cannot reach this conclusion from the evidence. In the case of Brown v. Hildebran, Docket 270, filed 7 May, 1930, and reported in the March Advance Sheet, this Commission adopted the rule that if a master would have to respond in damages to a third party for an injury inflicted by his servant, then the servant under the Workmen's Compensation Act is entitled to recover, and if we apply this rule to the instant case, this claimant is entitled to compensation.
If this claimant had met with an accident during the period of time between his last delivery of milk and collection of account and the time that he boarded the truck to return to the dairy and while engaged in matters that had no connection with the master's business we would have before us the question as to whether or not such deviation had the effect of suspending the relationship of master and servant, but this is not the case, because the claimant met with his accident on the return trip to the dairy and after he had completed his personal business, and the master's business was resumed at the time he boarded the truck for the purpose of returning it to its proper place, and this being true the full Commission holds that the admitted deviation of from one to two hours does not bar a recovery. See Jones v. Weigand, 134 Appellate Division, New York, 644;Peppers v. Wiggins Drug Stores, Inc., N.C. Ind. Com., Vol. 1, p. 164;Bryan v. Bunis, 208 Appellate Division, Supreme Court, New York, page 389;Kohlman v. Hyland, 54 N.D. 710; 50 A.L.R., 1437; Riley v. Standard OilCo., 231 N.Y. 301.
The full Commission concludes that even if this claimant temporarily abandoned his master's business when visiting the barber shop and pool room and other places on his personal business and for his personal amusement, he resumed it on starting to return the truck of the master to its proper place.
Upon consideration of all the evidence in this case the Commission directs that the finding of Commissioner Dorsett that the accident did not arise out of and in the course of the employment be and the same is hereby vacated and set aside, and that the following findings of fact be substituted therefor, to wit: (1) That the claimant, J. B. Jackson, at the time of his alleged injury, was in the employ of the defendant, Dairymen's Creamery. (2) That on 13 September, 1930, he sustained an accident and injury which arose out of and in the course of his employment. (3) That at the time of the accident and injury his average weekly wages amounted to $17.50 per week. (4) That the claimant has been totally incapacitated from the performance of ordinary labor since 13 September, 1930. (5) That the extent of his permanent disability cannot be determined at this time.
It is thereupon ordered that an award issue providing for the payment of compensation to the claimant at the rate of $10.50 per week to begin *Page 199 
as of 13 September, 1930, and to continue until further order of this Commission and that the defendants pay all hospital and medical bills. It is further ordered that this case be set for further hearing at such time as the injuries of the claimant may reach a permanent status."
The defendants appealed from this opinion to the Superior Court. The following judgment was rendered: "This cause coming on to be heard and being heard before the undersigned judge of the Superior Court duly commissioned to hold the regular August-September Mixed Term for Buncombe County while said court was sitting in regular session, upon the defendants' appeal from the North Carolina Industrial Commission, and after hearing argument of counsel for both plaintiff and defendants, and the court being of the opinion that the findings of fact, conclusions of law and award of the Industrial Commission should be affirmed, it is, ordered, adjudged and considered that the findings of fact, conclusions of law and award heretofore made in this matter by the Industrial Commission be and the same hereby are in all respects affirmed, and the case is hereby remanded to the Industrial Commission for further proceedings according to law."
The exceptions and assignments of error made by defendants, are as follows: "The Commission erred in finding as a fact that on 13 September, 1930, the claimant sustained an accident and injury which arose out of and in the course of his employment, and respectfully submit that said finding of fact should have read as follows: `That on 13 September, 1930, the claimant sustained an accident and injury which did not arise out of or in the course of his employment.' The Commission erred in not finding as a fact that the claimant, J. B. Jackson, sustained an accident and injury occasioned by the intoxication of the said claimant. The Commission erred in awarding claimant compensation for the injuries received on 13 September, 1930." The exceptions and assignments of error and necessary facts will be considered in the opinion.
The questions involved: (1) Did the accident in this action arise out of and in the course of the plaintiff's employment? We think so. (2) Is there any evidence from which the Commission could find that the injury was occasioned by the intoxication of the plaintiff? We think not.
We think there was sufficient competent evidence to sustain the findings of fact "that on 13 September, 1930, he (plaintiff) sustained an accident and injury which arose out of and in the course of his *Page 200 
employment." Public Laws 1929, chap. 120, known as the "N.C. Workmen's Compensation Act," sec. 2(f). "The findings of fact by the Industrial Commission in a hearing before them is conclusive upon appeal when there is sufficient competent evidence to sustain the award." Williams v. Thompson, 200 N.C. at p. 465.
The evidence was to the effect that plaintiff was in the employ of the defendant, Dairymen's Creamery, that had its place of business just outside of Asheville. Plaintiff every night, usually about seven o'clock, left his truck in the back yard of the creamery, where he lived about 50 feet from the creamery. There was a "milk war" on in Asheville, price cutting, etc., customers were changing due to lower prices.
Plaintiff testified, in part: "I was employed by the Dairymen's Creamery. I was delivering milk to cafes and stores and hospitals and had charge of what is known as a `milk route.' I was supposed to get up and get to town by six or six-thirty. I generally loaded up about five-thirty. That is what I did on the 13th. . . . I went back the third time and got some more milk. I don't know about what time it was I left the plant the third time. I had no watch. I guess about eight o'clock. It was between sundown and dark when I got the last order. I gave it to the Broadway Cafe. . . . I went to Rogers Cafe and ate supper and then I went and got a hair cut, shave and shoe shine in the Square Barber Shop, and then I went to Chase Street and finished collecting on a bill. That was after supper. I talked to several of my customers and then went back to the cafe. . . . I parked my truck in front of Rogers Cafe. It was there probably an hour or two, maybe two hours. Q. What I want to know is, during that two hours you were engaged in eating supper and getting a hair cut and attending to these collections, did that take the entire two hours your truck was parked? A. It did, and talking to those fellows and spending time with them. I did not take any time during that time to go out on any pleasure expedition of my own. . . . I might have shot one game of pool or two games or something like that the night I was hurt. I can't say positively how many games I did shoot. I may have gone in there and shot one game. I think it was one or maybe two games. That was after supper. . . . I was not in there very long, just a few minutes. That was after I had attended to all my collections and stuff, after I got through. I was through with everything. I got through with my collections around ten or eleven o'clock. . . . When my people employed me, they employed me to get all the business I could and gave me orders to hold every customer I could regardless of how I could hold them until milk came down right away. They said to hold them from day to day until milk came back down and not to let them quit, but to tell *Page 201 
them they would make it right with them. . . . I didn't use my truck from that time until I started back and had the wreck. It was parked all the time from then until I started back home. It was between nine and ten o'clock when I made my delivery to the Broadway Cafe. . . . It was between seven and eight o'clock, somewhere along there when I left town to go back there. I went out there and got the milk and came to town. . . . I have a five-year certified statement for driving without an accident."
Plaintiff, when he took the truck where it was parked and started home to the plant on Craggy Road, went a direct route. He testified further: "It was about eleven o'clock that I was hurt. I met a car. It was kind of foggy and the light glared in my face and blinded me. I cut out on the side of the road and whenever the car passed by I was blinded and cut back to the left and I cut too far and when I hit the edge of the curb the lights shone up and I could see I was too far on the left-hand side. I cut back to the right and the steering wheel turned over. One of the cross-arms on the steering wheel had been broken several weeks and whenever I cut it back the other way the other one came out. I had it come out once before then. It had come out and turned over one time before, running slow. The wheel turned over and bent like that. I had no control over it and it shot across the road. Whenever I hit the curb my steering wheel turned and I turned back into the road as I turned it to the right. The arm was broken off the left side and had been wrapped with tape. I had complained of it. When it was first taped Mr. Mason wrapped it and said he would try to get one right away. It was too light a steering wheel for that heavy a truck."
Defendants introduced George Netherton, who testified, in part, that he was bookkeeper for the defendant creamery at the time of the injury to plaintiff. "He is supposed to get off from work as soon as he gets through. He has no regular time. His time is not limited. He is supposed to take care of his customers regardless of what time it is. I don't think he would be supposed to work all night. His employment has no limit. . . . We had a hard time holding our customers at that time, and it was part of his duties to interview and hold customers."
Defendants introduced R. H. Mason, manager of defendant's creamery and directly in charge of plaintiff, who testified, in part: "He came to work about six o'clock in the morning. He got his morning deliveries and worked his trade. He was responsible for his collections and for building up his route and keeping it up. . . . Generally speaking, he was off around seven o'clock. There were times when he worked later than that. All the trucks had to be in the yard when a man finished his work. It is the drivers' business to solicit new business, and some *Page 202 
business was solicited at night, some in the day time. Some cafes were busy, and he could do more with them at night. . . . There were no stated hours. . . . It is customary for our delivery men to keep trucks out after working hours while they are calling on our customers and making collections. It has happened that our drivers brought our trucks in sometimes at very late hours for that reason. No special permission was given Jackson to keep the truck out at night if he was calling on trade in the interest of our business, but it was taken for granted. That practice had our sanction. Ordinarily the trucks were in around seven o'clock. At that time, however, there was quite a bit of price cutting with regard to the sale of milk, and customers were changing due to the lower prices and there was a hard drive maintained at that time in order to keep the customers we had and gain some more. The steering wheel had been broken. A portion of it was broken and had been taped up."
From Parrish v. Armour Co., 200 N.C. at p. 660, we again quote Pollock on Torts, 6th ed., at p. 84, as follows: "Whether the servant is really bent on his master's affairs or not is a question of fact, but a question which may be troublesome. Distinctions are suggested by some of the reported cases which are almost too fine to be acceptable. The principle, however, is intelligible and rational. Not every deviation of the servant from the strict execution of duty, nor every disregard of particular instructions, will be such an interruption of the course of employment as to determine or suspend the master's responsibility. But where there is not merely deviation, but a total departure from the course of the master's business, so that the servant may be said to be `on a frolic of his own,' the master is no longer answerable for the servant's conduct."
The plaintiff had parked his truck in front of Rogers Cafe, some one or two hours before the injury. He had been on duty from 5:30 o'clock until after his regular hours, to hold his employers' business. His was not "eye service" during the milk war. "Servants, obey in all things your masters according to the flesh; not with eye service, as men-pleasers; but in singleness of heart, fearing God." Colossians 3 :22. After being on duty some fifteen hours, he parked his truck in front of the cafe, no doubt hungry from his arduous duties, and went into the cafe and ate supper; then he got a hair cut, shave and shoe shine, collected a bill, talked to several customers, played a game of pool — all these took an hour or two — and then got in the truck and started home. Plaintiff is not a machine, in daily tasks human needs must be considered and recognized. He was not injured during the hour or two in which the truck was parked, but when in the truck going to his home and where *Page 203 
the truck was kept. We cannot hold, under the facts and circumstances of this case, that during the interim, for the purposes above mentioned, there was such a total departure from the course of the master's business that would bar recovery. Parrish v. Armour, supra, at p. 654; Bellamy v. Mfg.Co., 200 N.C. 678.
In Willis' Workmen's Compensation (27th ed.), at p. 29, we find: "In giving judgment in Benson v. Lancashire and Yorkshire Rail Co. (1904), 1 K. B., 242; 6 W. C. C., 20, Mathew L. J., said (at p. 251): `I do not think that the protection given by the act can be confined to the time during which a workman is actually engaged in manual labor, and that he would not be protected during the intervals of leisure which may occur in the course of his daily employment. A workman is not a machine, and must be treated as likely to act as workmen ordinarily would during such intervals; and, as regards any reasonable use which, while on the employer's premises, he may make of moments when he is not actually working. I must not be supposed to say that he would be thereby deprived of the protection of the act.' . . . Where his actual work is finished but the workman is waiting for his pay (Mayor v. Leyland (1920), 13 B. W. C. C., 115). So, when a drayman's employment kept him about the streets without any regular intervals for meals, it was held to be incidental to his employment that he should leave his dray during the course of the day for the purpose of obtaining reasonable refreshment. (Martin v. Lovibond (1914), 2 K. B., 227; 7 B. W. C. C., 243). . . . (At p. 77): If during meal-times or other intervals, the workman remains on the employer's premises under such circumstances that he continues in the course of his employment, . . . the risks of so doing, for example, locality risks, . . . or risks arising from reasonable acts . . . are risks incidental to his employment."
The cases cited in the opinion of the Industrial Commission are in accordance with the position here taken. Kohlman v. Hyland, 54 N.D. 710,210 N.W. 643, is annotated in 50 A.L.R., 1437.
As to the second exception and assignment of error, there is no evidence on the record to sustain the contention that plaintiff was intoxicated when he was injured. There is evidence that he bought a bottle of liquor on his way home, but he did not drink any of it and it was broken when the accident occurred. He is guilty of buying and possessing liquor, contrary to the statute (3 C. S., sec. 3411(b), but we cannot see how that would deprive plaintiff of a recovery in this action for his serious injuries. His injuries consisted of two broken legs, a stab wound in the back and minor bruises, also cuts over the body.
The judgment below is
Affirmed. *Page 204